# CHARLESTON.

## RATLIFF v. SOMMERS.

Submitted January 20, 1904.—Decided February 16, 1904.

1. EQUITY PLEADINGS.

It, is impracticable to lay down a rule in reference to amendments of equity pleadings which shall govern in all cases. Their allowance must, at every stage of the cause, rest in the discretion of the court; and that discretion must depend largely on the special circumstances of each case. The ends of justice should never be sacrificed to mere form, or by too rigid an adherence to teachnical rules of practice. (p. 37).

2. BILLS—*Court.*

Courts are much stricter in permitting amendments to answers than to bills. (p. 37).

3. PAROL CONTRACT—*Purchaser.*

Where a purchaser under a parol contract has been placed in possession and held under the contract and paid all or part of the purchase money, and made valuable permanent improvements upon the land, and such possession has been actual, and exclusive and not as a tenant of the vendor, he may maintain his bill in a court of equity for specific performance. (p. 38).

Appeal from Circuit Court, Lewis County.

Bill by William Ratliff against Martha M. Sommers and others. Decree for plaintiff, and defendants appeal.

*Affirmed.*

LINN & BLAND, for appellants.

EDWARD A. BRANNON and LOUIS BENNETT, for appellee.

McWHORTER, JUDGE:

William Ratliff filed his bill in the circuit court of Lewis county against Martha M. Sommers *et al.,* heirs at law, and administrator *de bonis non* with the will annexed of G. D. Camden, deceased, for the purpose of enforcing specific performance of a contract made with the said G. D. Camden in his lifetime, for a tract of eighty-eight and three-fourth acres of land on Oil Creek, setting forth the metes and bounds thereof in his will, alleging that negotiations were commenced as early as 1874 for the purchase of said land, and filed with his bill as exhibits, certain letters and fragments of letters from

G. D. Camden indicating such negotiations and also two letters as follows:

"Wm. Ratliff, Esq. Your letter was duly received some weeks before we left home and I expected to have written you before we left but was too busy to look over your account since coming here I have looked it over and find it alright. I wish you would buy the land and you can have it for $4 an acre. I will let your account of $150 go as payment on the land. If you wish it and you can have all the time you wish to finish paying for the land. Please see that no one cuts any of the timber on adjoining lands. Yours truly, G. D. Camden, per Mrs. G. D. Camden, Florida, March 28th, 1884."

"Eureka Springs, March 20th, 1888. Wm. Ratliff, Esq. I received your letter and I am glad to hear you are well. I am much improved since I came here. I thank you very much for the money you sent $160. This about or quite pays off your land and you better take the other little piece that joins you and you will have a nice farm on Oil Creek. My lands give me so much trouble to keep people from stealing the timber that I am going to sell them all. Please regard this letter as a receipt. I will be home soon and will make a deed. Yours truly, G. D. Camden, per Mrs. Camden."

He alleged that said letters so received constitute a valid and binding contract against said Camden and his estate for the specific conveyance by deed to plaintiff of said tract of land; that plaintiff had control and management of quite a quantity of said Camden's lands in Lewis county and was employed by Camden to watch and look after the same and keep trespassers from cutting timber and doing damage to the same, and for which work Camden promised, verbally and in writing, to pay him therefor, and the same was to go as a credit on said land purchase, which work, with the cash shown by said receipts to have been paid on said land had fully and more than paid for said tract at the price of $4 per acre; that at the date of the letters, written from Florida, Camden possessed a large number of tracts in Lewis county and had extensive business interests generally, and about the date of the said letters his health became impaired but he retained his mental vigor up to the time of his death, and during the period of 1884 and up to 1889 his wife, Mrs. Camden, was authorized by him, to do

and perform such work and acts as represented by said letters, contracts, and receipts, which he would dictate to her and she would write at his instance and request, and she would sign many of his important legal papers, such as contracts for sale of land, receipts for purchase money and other papers as appear by the contracts, letters and receipts made a part of the bill; that Charles W. Lynch, was appointed and qualified as administrator *de-bonis non* with the will annexed of G. D. Camden, and praying that the said heirs at law be required to execute and deliver good and sufficient deed conveying to plaintiff the said tract of land, and for general relief.

The defendant, Charles W. Lynch, administrator, filed his demurrer and answer to the bill, and for ground of demurrer said that Myra H. Camden who was named in the process, but not made a party by the bill, but expressly stated therein not to be a necessary or material party, was a necessary party to the bill, and pleaded the statute of limitations, and answered denying that G. D. Camden had ever sold the land to plaintiff as claimed in his bill, and averring that John D. Davis and T. B. Camden, trustees named in a settlement made between the heirs and Myra H. Camden concerning the contest of the will, by deed dated the 21st of March, 1895, conveyed to the said heirs at law "All and singular, all the unsold and remaining lands that were conveyed to parties of the first part (trustees) by the deed aforesaid for the purposes in said deed mentioned, in the State of West Virginia, and elsewhere in any other state or country, and all the lands conveyed by said G. D. Camden to said Myra H. Camden and not sold and not conveyed by the said G. D. Camden, or sold and conveyed to her by parties of the first part." The defendants, Martha M. Sommers *et al.*, heirs at law, also filed their demurrer and answer, insisting that Myra H. Camden was a necessary party to the suit, and denying the sale to the plaintiff, as alleged in the bill. Depositions were taken and filed in the cause, and on the 18th day of March, 1899, the plaintiff tendered his amended bill which was filed and remanded to rules for the purpose of issuing process thereon and maturing the cause for hearing. The amended bill alleged that Myra H. Camden, who had intermarried with G. W. Atkinson, was a necessary party to the suit, and alleging in said bill, that said G. W.

Atkinson, by reason of his marital relations had also become a necessary party, and asking that the original bill be read as a part of the amended bill, and alleging that the said G. D. Camden being owner thereof, at one .time sold to one James Gay, by specific metes and bounds, which are set out in the bill, as well as the amended bill, the said eighty-eight and three-fourth acres of land on Oil Creek, which sale was afterwards cancelled and annulled and the same again became the property of Camden who for many years owned this and other lands in that section and employed Ratliff to look after the same for him and to attend not only to his general interests there, but especially to his intertsts in a warmly litigated suit about land pending in the circuit court of Lewis County between the said Camden and one John Keith et al., and promised to pay Ratliff a proper consideration for his services; that in pursuance of.said employment he had at great inconvenience to himself and at the loss of the friendship of many of his neighbors done work and performed services up to the spring of 1884, to the amount of $150, and more, which said Camden then agreed to pay to him, and still continued in the service and employment of Camden and his service thereabouts amounted to a large sum which Camden agreed to pay; that about 1886 or 1887, he and said Camden had an oral agreement by which Camden sold him the land at $4 per acre, he to have credit for the amount due him for services, and the residue, when ascertained to be paid by Ratliff who took possession of said land under said purchase with full knowledge and by the express consent of Camden, and had continued in adverse possession under said sale ever since; that Camden then, and repeatedly thereafter, promised Ratliff to draw up and execute a writing setting out the sale and the terms thereof, but being old and feeble in health he put off and delayed the execution of the same until the 24th of June, 1888, when plaintiff having fully paid up the entire purchase money on said land said Camden authorized and directed W. B. McGary to execute and deliver for him, to plaintiff a writing setting forth said sale and the payment of the purchase money which he did, being general agent for Camden to sell his Oil Creek lands, as well as other lands, and in pursuance of his general, as well as of his special authority, execute on behalf of G. D. Camden a writing selling said tract

of land to said Ratliff at said $4 per acre and stating that the entire purchase money had been duly settled with said Camden and signing the same with the name of G. D. Camden, by W. B. McGary, his attorney, and delivered the same to plaintiff; alleging that said Camden died on the 21st of April, 1891, without having made him a deed for said land though he had repeatedly promised to do so; that he left surviving him the heirs at law named, and his wife Myra H. Camden; that he left a will in which he devised all of his real estate to his said wife, (now Myra H. Atkinson); that said will was duly admitted to probate; that proceedings to set aside the will were instituted by the heirs at law of Camden which was finally compromised and Myra H. Camden conveyed to John J. Davis and T. B. Camden many of said G. D. Camden's lands, but expressly reserved in herself the title to all lands sold by G. D. Camden in his lifetime and remaining unconveyed at the time of his death, and that said trustee after having sold many tracts of said land under the trust, conveyed the residue of the tracts to the said heirs at law. Therefore plaintiff says that the title to said tract of eighty-eight and three-fourth acres of land was still in said Myra H. Camden, unless the court should hold that there was never a sale in the lifetime of said Camden, in which case it would be in the said heirs at law; that neither the said Myra H. Atkinson nor the said heirs at law had ever conveyed the land to plaintiff, and refused to do so, but that said land was sold to plaintiff and fully paid for, and prayed that it be decreed to him.

On the 23rd of June, 1899, the defendants, the heirs at law, and R. M. Ramsburg, administrator of G. D. Camden, deceased, who had been appointed in the place of Charles W. Lynch, moved the court to reject the said amended bill for the reasons set out in a paper filed with the said motion, and also excepted to much of the deposition of Louis Bennett, filed March 11, 1899, and the depositions of R. B. Brinkley and W. C. Ratliff, filed March 1, 1899, as related to the alleged contract or writing made by W. B. McGary referred to in the amended bill. The court overruled the motion to strike out the amended bill, but sustained the exceptions to the depositions of Louis Bennett, R. B. Brinkley, and W. C. Ratliff, and suppressed so much of said depositions as related to the alleged

contract, and said defendants then and by leave of the court
filed their several answers to the said amended bill, and leave
was granted to plaintiff to retake the depositions of Louis Ben-
nett, R. B. Brinkley and W. C. Ratliff, as to the matters sup-
pressed so far as relevant, upon proper notice. The paper
filed with the motion to strike out the amended bill and sup-
press the depositions asks that the amended bill be rejected ·
because the new matter alleged therein, if true, must have
been known by plaintiff and by the attorney who wrote the
original bill at the time as well as when the amended bill was
written, and that according to his own showing plaintiff had
been guilty of such neglect as he was not entitled to maintain
his amended bill, citing *Foutty* v. *Poar*, 35 W. Va. 70, (syl.
pt. 2), and other authorities. It also moved the court to strike
out all that part of the amended bill which alleged a contract,
written and signed and delivered by McGary, as agent for
Camden, and that McGary was the agent of said Camden, and
also all that part alleging an oral purchase of the land made by
the plaintiff in 1886, or 1887, because by said amended bill if
issue was joined on the amended bill and answer, and evidence
had been taken on both sides departs from the foundation of the
suit by seeking to set up and rely upon a written contract made
by W. B. McGary, as agent, and the evidence shows that said
McGary wrote the original bill. The depositions of Louis
Bennett and W. C. Ratliff were retaken. The cause was heard
on the first day of April, 1901, when the court decreed that
William Ratliff purchased said tract of land from Camden as
alleged in his bills, at the price of $4 per acre; that the pur-
chase price had been fully paid and satisfied, and that plaintiff
was entitled to a specific execution of said sale and conveyance
of said land to him; that the legal title thereto was in said
Myra H. Atkinson, and decreed that she and her husband, G.
W. Atkinson, convey the same to the plaintiff by proper deed,
and in default of their executing such deed appointed W. B.
McGary and Louis Bennett special commissioners to make the
deed on their behalf, and decreed costs against appellants.

The defendants, Dora E. Ramsburg, Genevieve B. Parr,
Martha M. Sommers, and Wilson L. Camden, appealed from
said decree, asigning as errors that the contract was not proved
as alleged; that the evidence in support of plaintiff's preten-

tions was insufficient ·and much of it fabricated, and in hearing the cause of the amended bill, and entertaining that bill and because the court should have refused relief to plaintiff because the evidence shows he came into court with unclean hands.

It clearly appears from the record, that Myra H. Atkinson was a necessary party to the suit as the legal title to the land in question remained in her, if the negotiations between Ratliff and Camden in his lifetime amounted to a sale of the land and if the court should so hold it would then become necessary for her to make the conveyance to the plaintiff, so that, as far as parties to the suit were concerned, an amended bill was necessary to bring her and her husband in as parties. In *Rexroad* v. *McQuain,* 24 W. Va. 32, (syl. pt. 1), it is held: "It is a cardinal rule in equity that all persons materially interested, either legally or beneficially in the subject matter of the suit must be made parties to the suit." *Gall* v. *Gall,* 50 W. Va. 523; 1 Hogg's Eq. Proc. sections 36, 323 & 324. When the proofs in a cause show that the plaintiff had a cause of action which entitled him to relief, that it is of similar nature to that alleged in his bill, and much as might be made available by proper amendments of his bill, the court will not dismiss the original bill without giving plaintiff an opportunity to amend within a reasonable time. *Doonan* v. *Glynn,* 26 W. Va. 225. "A plaintiff in a suit in chancery can only obtain relief upon the case made in his bill and not on a substantially different case made by the proof. But where the case made by the proof shows a right to relief and is not so different from the case made in the bill that under the rules of chancery pleading it could not be amended the plaintiff will be allowed to amend his ·bill to conform to the true state of the case." *Lamb* v. *Cecil,* 25 W. Va. 288, (syl. pt. 3) ; *Lamb* v. *Cecil,* 28 W. Va. 653; and to the same effect 1 Enc. Pl. & Pr., 485, and cases there cited. The amended bill in case at bar in no wise contradicts the allegations of the original bill or is inconsistent therewith. It alleged a parol sale of the land in 1886 or 1887, as shown by the original bill showing negotiations and acknowledgments of plaintiff's payments and rights; and, as further evidence of said sale and its payment the amended bill also refers to the writing made by McGary at the instance of Camden and at the request of plaintiff. Section 12, chapter

125, Code, makes ample provision for amendment to a declaration or bill, before, or even after, appearance of the defendant, "if substantial justice will be promoted thereby"—of course exacting such terms on the part of the plaintiff as justice in the premises may demand. See *Bird* v. *Stout,* 40 W. Va. 43, (syl. pt. 4). "Subject to the rights of the opposing party amendments to the pleadings can usually be made at any time before the jury have retired, or the hearing, in equity, is at an end." I. A. & E. Enc., (1st Ed.) 553, and cases there cited; 1 Hogg's Eq. Pr. section 322. In *Harden* v. *Boyd,* 113 U. S. 756, Justice Harlan, in delivering the opinion of the court, at page 761, says: "In reference to amendments of equity pleadings, the courts have found it impracticable to lay down a rule that would govern all cases. Their allowance must, at every stage of the cause, rest in the discretion of the court, and that discretion must depend largely on the special circumstances of each case. It may be said, generally, that in passing upon applications to amend, the ends of justice should never be sacrificed to mere form, or by too rigid an adherence to technical rules of practice." *Wiggins* v. *Railway Co.,* 142 U. S. 396, page 413; *Crockett* v. *Lee,* 7 Wheat 522; *Watts* v. *Waddle,* 6 Pet. 389; *Parkhurst* v. *VanCortlandt,* 1 Johns, Ch. 273; *Walden* v. *Bodley,* 14 Pet. 156; *Neale v. Neale,* 9 Wall 1. The case of *Fouty* v. *Poar,* 35 W. Va., cited by the appellants to show that the court should not have permitted the filing of the amended bill, is not a point. "Courts are much stricter in permitting amendments to answer than to bills," 1 Hogg's Eq. Proc., section 343, and authorities cited under "188." In case of *Fouty* v. *Poar* it is said: "To file an amended answer it should appear that the reasons for it are cogent and satisfactory; that the mistakes to be corrected or facts to be added are made highly probable, if not certain, that they are material; that the party has not been guilty of gross negligence; and that the mistakes have been ascertained and the new facts have come to the knowledge of the party since the original answer." Citing *Mathews* v. *Dunbar,* 3 W. Va. 138; *Wyatt* v. *Thompson,* 10 W. Va. 645; *McKay* v. *McKay,* 33 W. Va. 736. In case at bar W. B. McGary prepared the bill and in his deposition he gives sufficient reasons for not filing it with the original bill. There is no negligence on the part of plain-

tiff himself in the preparation of his bill. In *Davisson* v. *Davisson,* 13 N. J. Eq. 246: "The bill in this case permitted to be amended after final hearing so as to make the contract alleged agree with that proved." *Abbott* v. *L'Hommedieu,* 10 W. Va. 677, (syl. pt. 2), it is held: "The exercise of the equity branch of jurisprudence respecting the rescission and specific performance of contracts, is not a matter of right in either party; but it is a matter of discretion in the court, not indeed, an arbitrary or capricious discretion, dependent upon the mere pleasure of the Judge, but of that sound and reasonable discretion, which governs itself as far as it may, by general rules and principles, but, at the same time, which withholds or grants relief according to the circumstances of each particular case, when these rules and principles will not furnish any exact measure of justice between the parties." And in *Lowry* v. *Buffington,* 6 W. Va. 249, (syl. pts. 1 & 2): "(1). When there has been a part performance of a contract for the sale of land by the purchaser being put into possession of the property, and payment of the purchase money, or a part thereof, and an offer to pay the residue according to contract, and valuable improvements have been on the land by the purchaser in faith of the contract, the statute of frauds cannot be successfully pleaded in bar to the performance in a Court of Equity. (2). Applications to the Court to compel specific performance, are addressed to its discretion; but it is not an arbitrary or capricious discretion, but a sound judicial discretion regulated by the established principles of the Court." "It is apparent that the general rule requires the contract sought to be specifically enforced to be in writing and signed by the party to be charged, or his agent. But courts of equity treat parol contracts for the sale or exchange of real estate, when there has been part performance, as valid and as effectual as things evidenced by the most solemn instruments in writing." Hogg's Eq. Pro. section 398, and cases there cited. And in the same section it is said: "In order to prevent the possibility of fraud, however, in engrafting this exception upon the statute of frauds, it is settled that the parol agreement relied upon must be certain and definite in its terms; the acts proved in part performance must, therefore, result from or be in pursuance of the agreement: and the agreement must have been so far executed

that a refusal of full execution would operate as a fraud upon the party and place him in a situation which would not allow of adequate relief by way of compensation in damages."

Where the purchaser has been placed in possession and held under the contract and paid all or part of the purchase money, and made valuable and permanent improvements upon the land and such possession having been actual, and exclusive, and not as a tenant of the vendor, when this can be shown to the satisfaction of a court of equity he can maintain his bill for specific performance. *Miller* v. *Lorentz,* 39 W. Va. 160; *Gallagher* v. *Gallagher,* 31 W. Va. 9; *Goodwin.* v. *Bartlett,* 43 W Va. 332; *Middleton* v. *Selby,* 19 W. Va. 167, (syl. pt. 4).

The original bill does not set up the writing made by W. B. McGary, agent of Camden, dated the 24th day of June, 1888. While the paper written by McGary is some times referred to as a sale of the land, yet it was not, strictly speaking, a sale. It was a mere memorandum to show that the sale had formerly taken place, and that the purchase money for the land had been paid by Ratliff, and that he was entitled to a deed. The evidence of Brinkley, and McGary, touching the interview between Camden and Ratliff at the Bailey House, leading to the making of the paper by McGary, was competent to be given under the original bill as it referred to negotiations which had taken place between Camden and Ratliff at times prior to that and to statements then made by Camden as to Ratliff's right to. the land and to a deed therefor.

As to the introduction of the paper writing prepared by McGary, it is insisted by appellant that the foundation is not sufficiently laid to prove its contents as a lost paper. Witness Louis Bennett, states that W. C. Ratliff brought the paper to him and showed it to him; that he made a memorandum of it, and he thinks he gave it back to Ratliff, intending to make it a part of his deposition as proof of the sale; that he. had looked carefully through his papers first, wherever he thought it might be found and had insisted upon W. C. Ratliff making a like search; that they had not succeeded in finding it, and that witness did not know where it was; that the paper was dated June 24, 1888, and was in the handwriting of W. B. McGary; that it bore evidence of some age and described the paper upon which it was written, and states that his memorandum taken from the paper at the

time that he saw it was as follows: "G. D. Camden to Wm. Ratliff by W. B. McGary his agt. & Atty, dated June 24th, 88— sells land where Ratliff lived on Oil Crk at $4. an acre settled with Judge Camden." W. C. Ratliff swears that he took the paper from Robert Brinkley, he thinks about a year and a half before he testified, on the 15th of August, 1899, and took it to Weston and gave it to Mr. Louis Bennett to look at; that he did not recollect whether Bennett returned the paper to him or not; that he had made diligent search for it, had looked through all papers about the house and was unable to find it, and that he knew no other place where he could reasonably expect to find it, and that he never gave it to anybody else after he showed it to Mr. Bennett. This traces the paper to the possession of Bennett and W. C. Ratliff, and that it was never given to any other person, and they were both sufficiently definite as to their search for it and their inability to find it. Mr. McGary states that Judge Camden had considerable transactions with plaintiff; that he was at Weston on one occasion and plaintiff and Robert Brinkley were there at the same time; that Ratliff was at Judge Camden for a deed for the land on Oil creek; that witness understood Judge Camden had sold him. "Judge Camden told Ratliff, and told me to go on and have the matter fixed up, or he would have me to fix it up, and whatever I did would be all right. That he intended Ratliff to have this piece of land, or words to this effect. I told the Judge, Ratliff's claim about the matter; that Ratliff had done some work on a run which went through the place which if it had not been done would have washed all the bottom land on this piece away. When I left the Judge at this time, I was to fix the necessary writing to suit Ratliff, or satisfy him that he would get the land." That after writing the contract between himself, as agent of Camden, and Ratliff, he delivered the same to Brinkley or Ratliff; that if he delivered it to Brinkley it was because Ratliff was under the influence of liquor and did not want to run the risk of his losing it, and the delivery was to Brinkley for Ratliff; "that the contents of the writing was what I gathered and understood from both parties at the time and prepared it in conformity therewith." There is no question about the sufficiency of the evidence that plaintiff went on to that tract of land and took possession of it as a purchaser about 1887, and has been in

such possession of it ever since. Witness Samuel Gay says plaintiff moved onto the place, he thinks, in 1887. That he heard Camden "tell Mr. Ratliff to go on to that place, that the land was his * * * Mr. Camden says 'you made me, or saved me $800'. He says, 'William, there is a piece over here across the hill adjoining that,' and he would let him have it right"; that the piece Ratliff was to go on to, was the "Jimmy Gay" tract. When asked why it was called the "Jimmy Gay tract" he answered: "Well, Jim Gay bought the land in the first place and it was run out to him and he failed to pay for it and left it." He also testified that the improvements made upon the place by plaintiff were worth, in his judgment, from $500.00 to $600.00. Joseph O. Keith also testified that he lived adjoining the land; that plaintiff moved on to the place in 1887; that he made fencing on it and put some buildings on it, a granary, stable, dwelling-house and other small buildings. J. S. Riffle, a witness 52 years of age, living on Oil creek, and who knew the land claimed by the plaintiff, by the boundaries described, said it had been called the "Jimmy Gay tract" until since Ratliff bought it, since which time it was called the Ratliff land; that he was with Ratliff and Judge Camden at Clarksburg and was asked to state the conversation, if any, that he heard between Ratliff and Judge Camden concerning the purchase of this Gay or Ratliff piece of land on Oil Creek, and stated as follows: "Well, what I heard stated was this: Mr. Ratliff asked Mr. Camden 'have you got my deed made yet?' Mr. Camden says, 'I have not. I have not been well. I have had a heap of work to do. Mr. Ratliff, just as soon as I get able I am coming to Oil Creek, and then I will make you your deed. Mr. Ratliff, you go back home, tend to my land matters, and other matters which I have been directing and writing for you to do for me concerning this Keith matter. Now, Mr. Riffle, I want you to aid Mr. Ratliff all you possibly can concerning this Keith matter. Mr. Riffle, I would like to show you the charges that Mr. Keith has made against me in the last ten or twelve years. I am sorry to tell you Mr. Keith is trying to rob me of a considerable sum of money. I want you, Mr. John Wellen, to aid, and all other honest men there in that neighborhood, concerning this Keith matter. I will amply pay all you gentlemen for all the trouble that you put yourselves to in trying to hold

my own in this Keith matter. Now, please, you gentlemen, do all for me you possibly can.' 'Now', Mr. Ratliff says again, 'I would love to have my deed made.' 'Mr. Ratliff, I told you just a little bit ago that when I come to Oil Creek that I would make that deed. Mr. Ratliff I want to tell you that my word is as good as my bond. I let you have that land more reasonable than I would any other man on account of being willing, ready to assist me in everything that I have called upon you to do.' " Asked whether in the conversation about the deed he heard anything about whether the land had been paid for, answered, "No, sir; I didn't hear money mentioned by either party." That his understanding about it was that all that was between the two men was the deed; and stated that the conversation was then about ten or twelve years ago; that about 1875 or 1876 Ratliff collected rent for Judge Camden and continued from that time on to look after Judge Camden's interest on Oil Creek, and he would not have performed the services Ratliff did for less than $25.00 a year, and maybe a little more. R. B. Brinkley testifies to an interview between Mr. Camden and Mr. Ratliff as follows: "Well, to the best of my judgment, it was on the 24th day of June, 1888, at Weston, at the Bailey House. Mr. Ratliff asked Mr. Camden to give him a deed or writing to show that he had a right to this piece of land—that he didn't want to lose what he paid for it. And he told him that he was old, broke down, and couldn't do any business any further that time, and to go on; that the land was his; to make such improvements as he wanted to; that his word was as good as his bond. Ratliff insisted that he should make him some writing, and he said that he could not; that McGary was his attorney and he would fix the matter up." And said that McGary drew a writing and gave it to him for Ratliff and he kept it for him, and about a year before the taking of his deposition, which was in February, 1899, he gave the writing to W. C. Ratliff, son of plaintiff; that he thinks the writing was dated the 24th of June, 1888. Witness further states that plaintiff was acting as agent and doing business for Judge Camden, he thought, about twenty years, and that Ratliff had placed improvements—he had built a stable, house, granary and barn and he thought they would be worth from $700 to $800. J. D. Wellen testified to a conversation he heard between plaintiff and Judge Camden at the Bailey

House in Weston. "Mr. Ratliff wanted possession of this land, that he wanted to make some improvements. Mr. Camden said to go ahead, that the land was his, to the best of my knowledge." And he also states Ratliff had built a house and a granary and a barn and that the improvements ought to be worth from $500 to $700; that he didn't think he could do it for less.

It would seem that this evidence of the fact that Camden had placed plaintiff in possession of the land which he has ever since held under the contract of sale and promised to make a deed to the plaintiff would be quite sufficient to entitle the plaintiff to relief, but taken in connection with the evidence of services rendered to Judge Camden by the plaintiff after March, 1884, the date of the allowance for services of $150.00 seems to me to fully meet the requirements of the law as laid down in *Gallagher* v. *Gallagher,* 31 W. Va. 9; *Boggs* v. *Bodkin,* 32 W. Va. 566; *Harris* v. *Elliott,* 45 W. Va. 245; Hogg's Eq. Prac. 398, and cases cited. In addition to the oral testimony just mentioned the two exhibits filed with the original bill being letters dated March 28, 1884, and March 20, 1888, together with the evidence establishing the genuineness of these letters and receipts makes a decided preponderance of evidence sustaining the decree. The principal defence attempted in this case is to establish a conspiracy in which Mrs. Camden, now Atkinson, was the chief actor, to injure and destroy the estate, as far as it might be, of Judge Camden, and appellants have injected into the case in the way of testimony quite a large part of the trial of Owens and Mrs. Camden upon indictments against them in Gilmer county. But all this goes for naught here, if these two letters are proved genuine and they fail to connect the plaintiff with such conspiracy, if such there was, and if the letters were written at the dates they bear they utterly fail to connect him with it. Such conspiracy if it existed, could not have been even thought of at the dates the letters bear. Without mentioning the testimony of Elizabeth C. Ratliff, the wife of plaintiff, in regard to the payment of the $160.00 mentioned in the letter of the 20th of March, 1888. The fact of the money being sent and letters received, as well as the receipt of the letter of March 24, 1884, is proved by W. G. Ratliff. The letter of March 20, 1888, is also proved by Martha A. Ratliff; and Joseph O. Keith testifies that he saw these two letters with Ratliff's papers in 1888,

and no attempt is made to impeach any of these witnesses. These facts being true whatever there may have been in the way of a conspiracy such as is attempted to be shown cannot affect the case because the letters were in the possession of Ratliff before the death of Judge Camden.

As to the question of the statute of limitations, the plaintiff was in possession from 1887, and being in possession the doctrine of *laches* does not apply. *Abbott* v. *L'Hommedieu,* 10 W. Va. 678; *Zane* v. *Zane,* 6 Munf. 406; *Ballard* v. *Ballard,* 25 W. Va. 470, (syl. pt. 3). Appellants in their brief raise the question as to the propriety at least, of attorneys for appellee testifying in the cause, and cite authorities disapproving the practice. We agree with appellants that as a rule it is not proper, but like all other rules, there are exceptions; as stated in *Potter* v. *Inhabitants of Ware,* 1 Cush. 519, cited by appellants where it is held: "In most cases counsel cannot testify for their client without subjecting themselves to just reprehension. But there may be cases in which they can do it not only without dishonor, but in which it is their duty to do it. Such cases, however, are rare; and whenever they occur they necessarily cause great pain to counsel of the right spirit." We think it clearly appears that this case is a just exception to the rule; especially in the case of the attorney and witness, Louis Bennett, to whom the witness, W. C. Ratliff, had delivered the writing which was lost and it could not be accounted for without the testimony of Bennett who was the only person who had possession of the paper besides W. C. Ratliff after Brinkley delivered it to said Ratliff and it was absolutely necessary for him to show what he did with it or to account for it by showing that if left with him it was lost or mislaid and could not be found, the possession of it laid between him and W. C. Ratliff and neither one of them alone could account for it; the evidence of both was necessary.

Appellants in their brief assert that the Judge who heard the case and rendered the decree was disqualified, and base their charge of disqualification upon the affidavit of R. M. Ramsburg, administrator, of G. D. Camden, deceased, to the effect that in a suit pending in Harrison county in the name of *Despard et al.,* plaintiffs, v. *G. D. Camden and J. M. Bennett,* defendants, wherein the heirs and devisees of J. M. Bennett, the said Judge being one of the heirs, and the heirs and devisees of Despard and

the heirs of G. D. Camden, were parties, wherein it was sought to recover against the estate of said J. M. Bennett, deceased, a large sum of money on account of moneys collected by the said Bennett on account of sales of lands which belonged to the said J. M. Bennett, G. D. Camden and B. Despard in which suit the heirs and devisees of Bennett claimed a large sum as credit or offset against the demand so made for services claimed by them to have been rendered by the said J. M. Bennett in looking after the interests of the joint owners in the lands and the proceeds and to prove an express promise on the part of G. D. Camden to pay said Bennett for the alleged services. Mrs. Camden was introduced as a witness on behalf of said Bennett's heirs and divisees, she then being the widow of said Camden and the same person who wrote the papers filed in this cause which were charged to be fraudulent, said affidavit setting forth the fact of the indictments of Mrs. Camden and J. P. Owens in Gilmer county for fraudulently uttering said papers, Mrs. Camden being indicted as accessory before the fact, and that Louis Bennett with others had become her surety in recognizance for her appearance to answer the indictment; that affiant was reliably informed that Louis Bennett, a brother of said Judge Bennett, and a witness for plaintiff Ratliff had openly declared that the Camden heirs were fighting him and that he was fighting them, and further declaring that to be a reason that he would not give consent for the Camdens to cross his land with timber or sell to them, over which lands was the only way the said Camdens could get certain of their timber to market, but would hold it so as to prevent said timber from being marketed, (this on account of said litigation in Harrison county), and that the interests of said W. G. Bennett, Judge, and Louis Bennett in said litigation were identical; and further alleging that in an equity suit in Webster county of R. C. Ferrell against the administrator and heirs at law of said Camden based upon alleged receipts for $4,000 purporting to be dated a short time before the death of G. D. Camden and to be for lands in Webster county which were signed G. D. Camden, per Mrs. Camden, and which suit was decided by said Bennett, Judge, in favor of said Ferrell; that some time after said decision in favor of said Ferrell, persons acting under said Ferrell began to strip the land in controversy of valuable timber and that said administrator and

heirs presented to said Bennett in vacation, a bill of review alleging newly discovered evidence and that timber was being removed and asked for an injunction, which bill of review so praying for the injunction was held by said judge about two months and leave to file the same then refused, and that the administrator and heirs to protect their rights were driven to an appeal to the Supreme Court from the order of refusal, which appeal was then pending in the Supreme Court.

It appears from the brief of counsel for appellants that the theory of the disqualification is the fact of the judge having an interest in the litigation mentioned in Harrison county wherein his brother, Louis Bennett, and Mrs. Camden, witnesses for appellant in this case, are also witnesses in the litigation mentioned in Harrison county, and that it was improper for the Judge in this case to pass upon the weight of their tesitmony, as he would be interested in sustaining the testimony of the witnesses; that he is interested in maintaining their credit. It is not contended that he has any pecuniary or other interest in the case at bar. In *Forest Coal Company* v. *Doolittle,* 46 S. E. 328, (syl. pt. 3), it is held: "In order to disqualify, the interest of the Judge must be in subject matter of the cause, and not merely in a legal question involved in it." It may not be out of place to say here, that the first appeal mentioned in the affidavit of Ramsburg as pending in the Supreme Court of Appeals was dismissed by the Court, 49 W. Va. 225; and the second appeal from the order of refusing the filing of the bill of review was affirmed by that Court, 50 W. Va. 119.

There being no reversible error in the decree the same is affirmed.

*Affirmed.*